Sedgwick, J.
The Gilbert Elevated Railroad is a corporation incorporated by a special private act passed June 17, 1872, (2 Laws of 1872, p. 2179). By this act it was authorized to construct an elevated railway through such streets, avenues, thoroughfares, and places as should be designated and established by a board of commissioners in such act created. The act provided that the railway to be constructed should be substantially supported above the middle of the streets and avenues, by iron arches, which should span the same from curb to curb, and the bases of which should not, when practicable, be more than sixty feet apart, nor the arches less than fifty feet from each other.
' The commissioners designated the streets, &c., through which the railway should be constructed.
In 1874, the constitution of 1846 was amended by adding to article 3 nine new sections, numbered from 17 to 25, both inclusive.* Section 18 prohibited the legislature from passing a private or local bill in certain enumerated cases, among them, “ granting to any corporation, association or individual, the’ right to lay down railroad tracks,” and commanded it to pass general laws for such case. This section further provided that no law should authorize' the construction or operation of a street railroad, except upon the condition that the consent of the owners of one-half, in value, the property bounded on, and the consent also, of the local authorities having the control of that portion of *492 a street or highway upon which it should be proposed to construct or operate such railroad, be first obtained, or in case the consent of such property owners could not be obtained, the general term of the supreme court in the district in which it should be proposed to be constructed, might, upon application, appoint three commissioners, who should determine, after a hearing of all parties interested, whether such railroad ought to be constructed or operated, and their determination, confirmed by the court, might be taken in lieu of the consent of the property owners.
In 1875, the legislature passed an act (Laws of 1875, p. 740) providing for the appointment, upon application of fifty reputable householders and taxpayers of any county, setting forth the need of a steam railway in such county, of commissioners, residents of such county, who should determine upon the necessity of such railway, and if they should find it necessary, then to determine its route, and giving to such commissioners the exclusive.power to locate the route of such railway, over, under, through and across, the streets, avenues, places or lands, in such county (with certain exceptions, among them such portions of streets and avenues as were then already legally designated for the main line of, or occupied by, an elevated or underground railroad in actual operation), provided that the consents, or the consent and determination required by the above amendment to the constitution were given or obtained.
Sections 5, 38, 40 and 41 of the act were as follows:
“ § 5. The said commissioners, having by such public notice as they may deem most proper and effective, under such conditions, and with such inducements as to them may seem most expedient, invited the submission of plans for the construction or operation of such railway or railways, the said commission *493 ers shall meet at a place and upon a day, in such public notice named, not more than ninety days after their • organization, and decide upon the plan or plans for the construction of such railway or railways with the necessary supports, turn-outs, switches, sidings, connections, landing-places, stations, buildings, platforms, stairways, elevators, telegraph and signal devices, or other requisite appliances upon the route or routes, and in the locations determined by them.”
“§ 36. Whenever the route or routes determined upon by said commissioners, coincide with the route or routes covered by the charter of an existing corporation, formed for the purpose provided for by this act, provided that said corporation has not forfeited its charter, or failed to comply with the provisions thereof, requiring the construction of a road or roads within the time prescribed by its charter, such corporation shall have the like power to construct and operate such railway or railways, upon fulfillment of the requirements and conditions imposed by said commissioners as a corporation specially formed under this act; and the said commissioners may fix and determine the route or routes by which any elevated steam railway or railways now in actual operation, may connect with other steam railways or the depots thereof, or with steam ferries, upon fulfillment by such elevated steam railway company, so far as it relates to such connection, of such of the requirements and conditions imposed by said commissioners under section 4 of this act, as are necessary to be fulfilled in such cases, under section 18 of article 3 of the constitution of this State, and such connecting elevated railway, shall, in such case, possess all the powers conferred by section 26 of this act; and when any connecting route or routes shall be so designated, such elevated railway company may construct such connection, with all the rights, and with like effect, as though *494 the same had been a part of the original route of such railway.”
“ § 40. This act shall not be construed to repeal, or in any manner to affect chapter 140 of the Laws of 1850, entitled ‘ An act to authorize the formation of railroad corporations, and to regulate the same,’ or the several acts amendatory thereof, or supplementary thereto. None of the provisions of this act shall apply to any railroad company, organized under any general or special law of this State, for the purpose of constructing or operating a steam railroad upon the surface of the ground, nor to the operation or management of any such railroad heretofore constructed.”
“§41. It shall not be lawful for any company organized under the provisions' of this act, or under any other act heretofore passed, to construct a steam railway upon St. Nicholas avenue, in the city of New York, or those streets or avenues in said city commonly known as boulevards, except to cross the same, under such regulations as shall be imposed by the commissioners provided for by this act, and every such company shall be bound by the restrictions and limitations as to its route, and as to its mode of construction, which "shall be established by the commissioners appointed under the acts from which its powers were derived, as far as such restrictions and limitations are consistent with the provisions of this act. The provisions of this section shall not be deemed to apply to any existing horse street railway heretofore authorized to be constructed.”
At the time of the passage of the act of 1875, defendants’ road was not in actual operation. After the passage of that act the defendant proceeded to erect along the route designated in the act of 1872, vertical posts in the middle of the streets and avenues, whereby to support its railway.
They claimed the right so to do, under powers granted *495 by commissioners appointed under the rapid transit act of 1875.
Evarts, Southmayd & Choate, for plaintiff.
Porter, Lowrey & Soren, for defendant.
Plaintiff under its charter operated a surface horse car railroad through the streets in which defendant was erecting the posts, and, claiming that it suffered a damage peculiar to itself by the erection of such posts, brought this action for an injunction.
Sedgwick, J.
The learned counsel for the defendants maintained that they derived their power to build an elevated railway from the act of J nne 17, 1872, and the other acts which amend it, passed before the constitutional amendments of 1875 ; that they gained no new franchise to build a railway under the so-called Rapid Transit Act of June 18, 1875, but that this last act left the defendant’s right to construct a road untouched, and resulted only in imposing upon defendants the duty of altering the structure described in the original acts, in certain mechanical and engineering details, which did not alter or impair the substance of the franchise under the first grant.
If this be true, then section 41 of the Rapid Transit Act has an important bearing upon this action, and perhaps decides it. That section declares “it shall not be lawful for any company organized under the provisions of this act, or under any other act heretofore passed, to construct a steam railway, &c., and every such company shall be bound by the restrictions and limitations, as to its route and as to its mode of construction, which shall be established by the commissioners appointed under the act from which its powers were derived, as far as such restrictions and limitations are consistent with the provisions of this act.”
As the defendants were organized, and derived *496 their powers to construct and operate a railway, under other acts than the Rapid Transit Act, they are bound by the restrictions and limitations as to mode of construction stated in those acts. Unless: First, such restrictions and limitations are not consistent with the provisions of the Rapid Transit Act; or, Second, unless the restrictions and limitations intended by the section are only such as had been specified by commissioners appointed under previous acts, and are not to be imposed in this case, inasmuch as the restrictions of the mode of construction are contained in the very body of the original acts, and are not established by commissioners under such acts.
As to the first, there is no provision of the Rapid Transit Act which is inconsistent with that part of the statutes which restrict the defendants to a particular mode of structure. May it be argued that such inconsistency may come into existence from a repugnancy between the directions of the original acts, and the requirements and conditions as to structure, that it is claimed' the commissioners under section 36 of the Rapid Transit Act, may impose upon the defendants to be fulfilled before they acquire a like power to operate the railway as a corporation specially formed % Not justly ; because the requirements to be imposed by the commissioners upon defendants are to be made after the passage of the law, form no part of the law, are not provisions of the law, and would never have the force of law in themselves, inasmuch as they would for their effect depend upon the voluntary acceptance of them as conditions by the defendant. The section, no doubt, meant to preserve, to some extent, the restrictions as to structure of the former acts. How could that be done if commissioners under the Rapid Transit Act had power to annul all restrictions ? or why attempt to restrict, if it were expedient and within the object of the legislature, that the commissioners under *497 the Rapid Transit Act should finally determine the form of structure of existing corporations ? The commissioners have, at least, power to make requirements and conditions that would be consistent, and the section shows no sign of referring t© a contingent or possible inconsistency. A right view would seem to be, that this section, as a part of the act, with all other of its provisions, spoke to the commissioners and directed them with all others, to obey the section, and to preserve the restrictions of former acts. As to the route, which is in pari materia, the act gives the existing corporation new power only where the route chosen for the new corporations is the same as that of an old corporation.
As to the second, I cannot think that the section referred only to such restrictions and limitations that had been made by commissioners under former acts rather than by the words of the act. The commissioners would speak only by authority given to them as agents of the State. The statute itself was the source of authority. The clause, “which shall be established by the commissioners,” has an erroneous reference to future time, and the whole of it should be considered as not being in itself a legislative mandate, but an incorrect statement of fact as to the place where the restrictions and limitatidns are to be found. The important thing is that the restrictions have been made by the law. It is not admissible to suppose that an intricate form of words was adopted to lead citizens to think that the section was to be understood and obeyed, when it was intentionally nothing more than a puzzle with no articulate meaning.
From the construction given to section 41, it would follow that it was unlawful to use the middle of the streets for the purpose of defendant’s railway, and that such use was an incumbrance of the highway and a public nuisance which might be restrained by action, *498 But there was little discussion at the trial as to the section, and I go to other aspects of the case.
We proceed to look to the constitution in its relation to defendant’s claim. The first section of article 8 of the constitution of 1846 was left untouched by the amendments of 1875. That section was: “Corporations may be formed under general laws, but shall not be created by special act except for municipal purposes and in cases where, in the judgment of the Legislature, the object of the corporation cannot be attained under general laws.”
The amendment in 1875 of the constitution, in section 18 of article 3, directs that the legislature shall pass general laws providing for, among other enumerated cases, the case of granting the right to lay down railroad tracks. After this the legislature could not adjudge that special acts were necessary to make in-corporations for such purpose, and after 1874 no special act could be constitutionally passed creating a corporation, the object of which was the laying down of railroad tracks. This is referred to for the purpose of learning the policy of the constitution in those parts to which more specific attention will be given.
By section 18 of the amendment, in article 3, the legislature was forbidden to pass a private or local bill “ granting to any corporation, association or individual the right to lay down railroad tracks,” and was commanded, to “pass general laws providing” for such case, “but no law shall authorize the construction or operation of a railroad track except upon the condition that the consent of the owners of one half in value of property bounded on, and the consent also of the local authorities having the control of, that portion of a street or highway, &c., &c., be first obtained, &c., &c.” This last clause suggests, which it is perhaps unnecessary to express, that the constitution, by the very limited words “right to lay down railroad tracks,” *499 refers to their use for the transportation of passengers in cars thereon, and to their relation to all those matters which are involved in the general phrase “the construction and operation of a railroad. ’ ’ The grant must come from a general law ; on the other hand it is invalid if it come from a private and not a public law.
The constitution meant to prevent in the future well-known evils that had arisen in the past. By it the sovereign power of the State cannot be parcelled out to individuals or private corporations by the legislature. Hence the legislature cannot give special privileges as favors or rewards. Ho one will seek special privileges or hold out inducements to grant them. The time and skill and thought of a legislature will not be absorbed by innumerable bills with particular or special objects. The people in different counties and towns need not watch through a session to be protected against injudicious acts, pushed by the representations or machinations of a few men, but all may know that the legislature can only pass laws for the wants of the whole people and all parts of the State.
A most important question is, what were the franchises the granting of which was the subject of regulation ? Of course, they were those which were possessed by the State, and might be disposed of or granted by the State.
They were not such rights as the citizen had and held without any grant from the State, The State alone had the power to incorporate natural persons. The specific value of the incorporation was that it substituted corporate responsibility in the stead of the responsibility of natural persons. The incorporation was made with reference to specific objects, but it was not a necessary characteristic of any of such objects, that itself should be a franehise to be derived from the State. In the present case the right to lay down railroad tracks is not a political franchise to be gained *500 only from the State. An incorporation made with power simply to lay down railway tracks, for any kind of structure or motive power, would receive from the public the franchise only of incorporation. Like a natural person, it needs no public franchise in respect of the railway. It could lay and build where it pleased, if it bought the land, and did not infringe other rights of third persons, under the public laws.. Other powers must be given in connection with the building of the railroad to constitute franchises. The corporation must be empowered to act as agents of the State in acquiring land under the right of eminent domain, or must have power to use public highways. It must be, therefore, that the constitution, in the amendments before us, referred to these franchises lastly described, or to others of the same kind. Here we need have no other concern than with the franchise or power of using a public street for the defendant’s railroad, and, in proceeding, such franchise is the one ■we will deem to be guarded by the constitution.
The next questions are, did the Eapid Transit Act (if it intended to give power to the defendants to build their railway in its present form of structure upon the Sixth avenue) grant another and a different right to lay down railroad tracks (within the meaning of the constitution), from the right given in the acts which originally incorporated them, and then, was such other grant made by general law, or was it given by a private bill»
The learned counsel for the defendants claim here that the amended constitution of 1875 did not repeal the original charter of the defendants. Clearly it did not. The further claim is, that the amendments did not take from the legislature the right to alter, modify, or repeal the charter. It would also seem clear that they did not, with this exception: The legislature could not violate any of the amendments, and could *501 not, by any alteration, modification, or repeal of a special charter, or any part of it, grant to the corporation a right to lay down railway tracks, which it did not have before. Here it is argued with very great ability, that the change of the structure required bv the commissioners under the Rapid Transit Act did not affect the substance of the franchise of the original charter, viz., to build an elevated railway to be operated on Gilbert’s plan, but were changes in engineering and mechanical details of the substructure, and were only modal; inasmuch as an elevated railway could be built in either way and be operated on Gilbert’s plan, and therefore no new franchise or right was given by the Rapid Transit Act to lay down railway tracks.
The consideration I have given to the nature of the franchise, protected by the constitution, has led me to believe that the defendants apply a wrong test to ascertain the constitutional character of the changes. If the laying of a track on any kind of structure, and the working of a railroad thereon, does not ask a franchise from the State, and no franchise is connected with these matters, until they ask a right to use a particular place for the situs of their railroad, viz., a public street, which must be got from the State, then the test is, do the changes which the Rapid Transit Act have required from the defendants, and which they have accepted, involve a right to use a street which is different from the right to use the street given by the original charter?
By all the rules of construction of legislative grants that I know, they confer no more of right on the grantee, and take no more from the people, than is described by the words of the grants. The power conferred is limited to the power described. Every inferred, much more every expressed, intent to limit or bound a franchise must be strictly observed. Each *502 limitation is in a sense a subtraction from what else would have been the franchise.
In a case like this, of a right to use the street, the legislature had clear reason to limit the use of the street to a particular kind of structure. The general project was untried, and there was need for abundant caution in not only providing adequate means of carrying travelers, but, in as far as possible, preserv- , ing those uses of the street which, by experience, had been generally serviceable.
Section 3 of the act of June 17,1872, authorized and empowered defendants to make, construct, and maintain an elevated railway, to be operated by the plan known as “ Gilbert’s Improved Elevated Railway.” The proof in this case shows that by this plan the tracks were supported by arches, the bases of which rested on the curb on either side of the street. The fact that such was the plan is to be connected with the language of section 4, which is explicit, that “the said tubular ways and railways, the said corporation is hereby authorized and empowered to construct, maintain and operate, shall be substantially supported above the middle of the streets and avenues by iron arches which shall span the same from curb to curb, the bases of which shall not, when practicable, be more than sixty feet apart, nor the arches less than fifty feet from each other.” Is it not certain that the legislature meant that the corporation was not empowered to build or maintain any railways which were not supported by arches rising from curbs in streets which, like Sixth avenue, were sixty feet in width; that the supports above the middle of the street were to be such arches, and not vertical posts in the middle of the street, and that the bed of the street should not be at all. incumbered at spaces less than fifty feet apart, longitudinally % The legislature expressed its meaning in the form of a com *503 mand. Could a corporation have any power or authority at all to violate such a command %
So far as these directions and limitations went, did they refer to matters in which the State as. such was alone interested, and alone entitled or bound to see enforced, as it could alone enforce a purely penal law, or amove from the possession of a franchise % We think not, for the following reasons, although others could be suggested.
In this act the legislature were devoting the public street to a particular use, which it was assumed it had the right to declare to be and to make a public use. In this regard, at least, the franchise was to make this particular use. Before the grant the public and individuals had certain definite rights in the street free from this particular use. This particular use carved into the rights of the public and individuals, but left to them all it did not take. There are not only a limited use described by the act, but, outside of it and not expressed in it, the remaining rights of third parties, which may be protected by any proceeding given by the law for the purpose.
Not looking at the arches simply as parts of an organic whole, nor adverting to the fact that a street may be put to a use by that part of a structure which is in the air above it, it is a fact to be seen and not merely inferred, that the street is put to a specific, definite, measurable use by placing the bases of arches upon and under the street surface at the curb. All not necessary, both as to space taken and relative place occupied, are-still reserved to the general public and to third persons, and if encroached upon or incumbered, there results a public nuisance. Neither party has power or authority to compel the other to submit to changes of the place in which their rights are. If there be a public nuisance from an unlawful incumbrance of the highway,. *504 any individual that suffers damage peculiar to himself may have an action.
There is no necessity of denying that the legislature, after the constitutional amendments, had the right to modify the provisions of the defendant’s original charter so as to change the character of the structure or substructure, as to strength, form, materials, color or of the motive power, in so far as these changes did not effect, or result in, another use of the street.
I go now to examine the authority of the defendant to make the changes of structure, and this authority it claims under the Rapid Transit Act. For the purpose of this decision, attention will be confined to the supports of the track, as eliciting considerations that will determine the rights of the parties.
The defendants claim that the action of the commissioners, under the Rapid Transit Act, has empowered them to support their track by two rows of vertical posts in the roadway, each about two feet from the outside of plaintiff’s tracks, about twenty-one feet from each other, and about twenty feet from the curb. The posts are about thirty-five feet from each other longitudinally. Does this change result in the use of the street different from the use given by the original charter %
We have seen that, under the first acts, the right of the defendants to occupy the bed of the street was confined to a part of the street at the curb, and excluded the right to occupy the street at different places in the middle.
In the same way, the defendant, under the Rapid Transit Act, was confined to the middle of the street, and this not only excluded them from a right to places at the curb, because of the legal construction of its grant, but because it was made a condition of the defendant receiving anything under the Rapid Transit Act. Either use being lawful, as to it, the other was *505 unlawful. They were not the same. They would not be the same if the defendants lawfully possessed a right to both.
Although it is not necessary, perhaps, we can go further and see that this difference indicated the different rights left in the public and third persons by the one or the other method of support. If the middle of the street be open from curb to curb, there is an unincumbered space sixty feet in width, the whole of which at any one point is the measure of the convenience and safety with which the street could be used. On the other hand, wherever the vertical posts' are set, and opposite and between them, the streets which can be used are narrowed to three in number of twenty feet each, and these posts occur every thirty-five feet. The lines of motion which travelers are at liberty to pursue are materially different in the two cases. I do not consider the more general results as to cleaning of the streets and other sanitary processes and conditions, or as to facilities given or taken for the action of the executive authority of the State and nation. Which use of the street is more expedient, when the general use has to be modified, is not to be decided by the court. It can only inquire if they be the same or not. The latter method may be far better for the special demand ; still the question remains, is the grant of the use justified by the constitution % It may be, that the prohibition as to grants implies that danger from special grants is to be found mainly when they would be sought as being beneficial to the public. I am, therefore, convinced that the defendants claim, under the Rapid Transit Act, a right to use the street different from the right limited by the original charter, and that a grant of this right is another and a different grant of the right to lay down railway tracks within the meaning of the constitution.
The next question is whether the grant claimed un *506 der the Rapid Transit Act is given by a general law, or is there a violation of the constitution in that respect ? The grant must be gained through a general law, or not at all.
It is not necessary to amplify the proposition, that if a law contains clauses which properly by themselves would make a general law, but has provisions which are not general in their nature, are not the particular consequences of the properly general clauses, and especially if they may go into full and perfect operation without the application of the general part, the law is not a general one as to these provisions. A law, to satisfy the constitution on this point, must be framed to present to all, the same right and opportunity to become enfranchised, and must not be so framed that some, being corporations or natural persons, have a right and opportunity either prior or superior to or in exclusion of others.
The constitution has reference to rights and opportunities offered by the law itself, and not to such actual results as depend upon the voluntary acts or omissions of individuals in claiming or neglecting to claim a right. The right and opportunity must be proffered to all in equal terms ; while in the nature of things some use the right, while those who do not are not excluded by any discrimination of the law against them.
We do not propose to decide whether, in all its aspects, the Rapid Transit Act violates the constitution, that requires a general law. It will be taken for granted that, in some respects, it is a general law. Its main scheme is that corporations shall become the grantees of the franchises; and we assume that it gives an equal right and opportunity to all to become the incorporators of the corporations to be formed. We pass by the question as to whether a law that may so operate that in the discretion of different sets of commissioners no grant, in any part of the State, may *507 be given, or may be given in some parts and not in others, is a general law providing for the granting of the franchise.
The act provides that commissioners shall be appointed in each county or city, upon a petition of citizens being filed. Then the commissioners, first, within thirty days determine whether there is a necessity for a steam railway; second, within thirty further days they “fix and determine the route ox routes for such steam railway or railways ’ ’; third, within not more than thirty further days they decide upon the plan for the construction of the railway, the time within which it is to be built, the amount' of capital stock, the number of shares, &c. ; fourth, they prepare articles of association which are to embody all the matters theretofore determined by them, they open subscriptions, and take other steps which result in the formation of corporations who are to become grantees of the franchises. The franchises granted are the right to be incorporated, and the right to use streets for the purpose of the .railway, according to the particular plan determined.
The enforcement of these provisions could never result in investing the present defendants with the right they claim under the Eapid Transit Act, and they must rest upon the position that section 36, under which they claim, is a part of the general act, and, taken with the rest, general in its character. It may be urged, that that section gives to all existing corporations only the same right and opportunity to be invested with the franchise that is given to corporations to be formed, and that existing corporations are a part of those whose chances to gain the franchise are to be protected by a general law.
Concede this position, and pass by a fundamental consideration that is probably true under the amended constitution, that an incorporation can in no way demand from the legislature that its powers be enlarged, *508 and omit to determine the effect of section 1 of article 8 of the constitution on this point, in forbidding special charters; ■ yet even then if existing corporations may demand, or if it may be valid, that a general law should provide for them with others in this matter, such law must give them and others equal rights or opportunities on equal terms. If, however, an exercise of the advantages given to existing corporations will determine, by the true construction of the law, that the law had not given to others any right at all to become grantees, then the equality is destroyed in favor of existing corporations. Such a law would be specially framed for the special advantage of existing corporations to the exclusion of others from the grants. Is there not to be found in such a law all the objections which rest upon a likelihood of the State suffering from those mischiefs which the constitution tried to extirpate %
Upon the argument it was substantially and properly conceded that the franchises of the defendant, under the original acts, would be repealed, if the general act, that is, the Rapid Transit Act, resulted in investing a corporation to be formed under it, with an inconsistent franchise. Granting that the act might have been so framed as not to repeal the defendant’s former franchise, 'the fact is, it was so framed that superior power and right might be given to another corporation to work a railroad upon the route, as it is called, to which the defendant, as an existing corporation, wras before entitled. In that case, the franchise of the defendant would be gone. Section 36 gives to the defendant, as an existing corporation, the following advantage. When the commissioners have fixed upon a route, which they think to be the best one for corporations to be formed under the act, if it is the same (we will say either in whole or in part), as the route that had been given by the legislature to an existing *509 corporation, the latter “ shall have the like power to construct and operate such railway or railways upon fulfillment of the requirements and conditions imposed by said commissioners as a corporation specially formed under this act.” We do not give any attention to the construction of the act as to the nature of the requirements and conditions intended by the act, although that is an important subject. It is enough now to see whether the section (if it give the defendants the right to make the changes in structure under consideration) is, in its character, a general law.’ Upon the contingency of a coincidence happening, and the existing corporation fulfilling the conditions, it is certain that the ensuing provisions which would result in giving the route to a corporation to be formed, die, and are as if they never had been. This does not merely stay the operation of the general law so that it shall not repeal an existing charter. It takes away a right and opportunity to gain a franchise, and gives it to a corporation already formed. The result is, that as to the particular franchise, it is not general in its proffers to all on equal terms, in that it benefits a particular class of corporations at the expense of the rights of all others; and the defendant’s claim cannot be supported under the requirement that such a franchise shall be given by a general law.
On this subject, it should be further observed, that if the law intended to authorize the commissioners, under section 36, to impose, as a requirement and condition, something which is a franchise, “to lay railroad tracks ” in the meaning of the constitution, the section did not also give any general law or mode of obtaining it, otherwise than to place it within the bare discretion or judgment of the commissioners to bestow or withhold. Plainly the legislature could not use its discretion or judgment as to its granting the franchise in particular cases. But, under section 36 of the statute, *510 the commissioners must proceed in each particular case. There is no authority in the legislature to give this power to commissioners which they had not themselves. Each time the commissioners grant a franchise, it is a special act, the same as a private bill.. It is the granting of a right ab origine,, and not the regulation of the enjoyment of a right already given.
In further illustration, it appears that section 36, so far as a grant under it to the defendant to construct as it intends is concerned, is complete in itself, and has no substantial connection with the other parts of the law. They gain, as they claim, the right, if the commissioners have settled upon a route for the corporation to be formed, which coincides with theirs, upon the fulfillment of certain conditions imposed by the commissioners. But thereupon no other part of the act, as to this particular route, could have vitality or operation. The section might have been passed by itself without a typographical correction, as it has no real connection with the other parts of the statute, and it might have directly enacted that if an existing corporation would build their road in a certain way,- with vertical supports in the middle of the street, and run so often and charge so much, they should have a right to use the streets for that purpose. It seems to be quite an immaterial incident to the proceeding which ends in the grant to the defendant that commissioners have ascertained that its route was one beneficial to the public in the course of finding what would be a proper route for future corporations.
I cannot think that such would be a general law, but, on the other hand, think that the law as it stands in section 36 is against the provision that no private law shall grant a right to lay down railway tracks.
If enacted by itself, it would have none of the attributes of a public law. It would difier from a law-passed for the benefit of a single private corporation in *511 its enfranchising more than one such corporation. It would be the equivalent of several private bills under one title. If the constitution feared the efforts of individual persono or corporations, in the pursuit of public franchises to be granted in a private bill, did it not mean to prevent the united efforts of several in the same pursuit % The result is that if the Rapid Transit Act intended to give to the defendant, as it claims, the right to use the Sixth avenue by placing its tracks upon upright columns in the middle of the street, it is in that respect unconstitutional.
I have consulted among others, the following cases : Wynehamer v. People, 13 N. Y. 378; Schenectady & Saratoga Plank Road Co. v. Thatcher, 11 Id. 113; Syracuse City Bank v. Davis, 16 Barb. 189 ; Warner v. People, 2 Denio, 372; Buffalo & N. Y. City R. Co. v. Dudley, 14 N. Y. 348; White v. Syracuse & Utica R. R. Co., 14 Barb. 559 ; Olcott v. Tioga R. R. Co., 20 N. Y. 210 ; People v. Allen, 42 Id. 379; People ex rel. City of Rochester v. Briggs, 50 Id. 533; Corning v. Green, 23 Barb. 34; Smith v. People, 47 N. Y. 331; Matter of Commissioners of Park, Albany, 52 Id. 137; People ex rel. &c. v. Albertson, 55 Id. 51; People ex rel. Schenectady Astronomical Observatory v. Allen, 42 Id. 404.
Upon the trial, I thought it was clear that the plaintiff suffered an injury peculiar to itself from the use of the street threatened by the defendants, which entitled it to maintain an action in its own behalf. The row of posts on either side is a limitation of the space which the plaintiff has under its charter a right to use for switches, turn-outs, &c., whenever they are required. Especially are these posts a special incumbrance upon the right to take off switches to its depot at Forty-third street.
The above views are but a part of the case, as it was presented at the trial. Many other objections were *512 made, based upon the statutes and upon the constitution. A competent examination of these would consume more time than has already been taken, and-nothing would be gained towards determining practically the rights of the parties here. These objections were grave and important. The true construction of the act is open to argument. To sustain the defendant’s claim, if it be correct that a right to use vertical supports in the-middle of the street is a particular and new use of the street, then the defendants gain a franchise by accepting it as a condition imposed upon them of receiving the power specified in section 36, which is a franchise. But it is best not to go into other details. Such views as have been expressed seem to me to be correct, but I do not forget that they are against strong positions taken by the counsel for the defendant, strengthened by all that can be furnished by learning, by reasoning, and by the eloquence of rhetoric and conviction. An appellate court will correct any error that has been made.
On the facts, my opinion is, that at the time the acts incorporating defendant were passed, the actual plan of Dr. Gilbert, as then known, had dispensed with tubes for passenger traffic, to be moved by atmospheric pressure, and had substituted therefor the ordinary open railway tracks, not to rest in a tube, or its equivalent, and to be used by steam locomotives.
There should be judgment for plaintiff that defendant be enjoined, &c., with costs.
Note.—These amendments to the constitution of 1846 were adopted by the People, at the election held in the fall of 1874 (Laws of 1874, p. 936), but as they did not go into effect until January, 1875, they are referred to in the above opinion as the amendments of 1875.

 See note at end of case.